IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,   CR 05-41-RE

        Plaintiff,   OPINION AND ORDER

   v.

MICHAEL L. LANGFORD,

        Defendant.

KARIN J. IMERGUT
United States Attorney
GARY Y. SUSSMAN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

        Attorneys for Plaintiff

GERALD M. NEEDHAM
Deputy Federal Defender
101 SW Main Street, Suite 1700
Portland, OR 97204-3228

        Attorney for Defendant

REDDEN, Judge:

The matter before the court is defendant's motion to suppress (# 31) statements made to United States Postal Inspectors on January 13, 2005, following his arrest for possession of stolen postal money orders in violation of 18 U.S.C. § 500. Oral argument was held July 22, 2005. I denied defendant's motion from the bench, and I now issue this opinion to explain my reasoning.

## Background

On December 31, 2004, the post office in Crabtree, Oregon, was robbed at gunpoint by two men. One wore a stocking cap and blue handkerchief around his face, and he carried a handgun. He pointed the gun at an employee named Shirely Moore, and ordered her to the floor. The other man jumped over the counter and tied Moore's hands and one leg behind her back with rope. The robbers then demanded cash, postal money orders (PMOs), and the money order imprinter, which is used to imprint a specific dollar amount on blank PMOs. The robbers took approximately $180 in cash, 300 blank PMOs, 6 PMOs with amounts already printed on them, and the imprinting machine. No one was injured in the robbery.

Moore was unable to identify either of the robbers. However, Moore said a local resident known as Steven Maneatis, had purchased a PMO for $7, two days before the robbery. An adult male and a small child were with Maneatis at the time.

Following the robbery, several people attempted to negotiate the stolen PMOs. Their arrests led police to defendant. On January 5, 2005, Gary Eugene Davis, Jr., was arrested after attempting to negotiate one of the stolen PMOs at a post office in Albany, Oregon. Defendant was reportedly waiting outside in a silver Chevrolet Venture mini-van. When police arrived at the post office, defendant drove away. However, one of the officers was able to identify

defendant as the driver of the van before he was out of sight. Davis later told officers that defendant had asked for assistance in cashing the stolen PMOs.

That same day, Albany police officer, Glenn Fairall, attempted to stop Maneatis' vehicle. Maneatis made an unsuccessful attempt to allude Officer Fairall. He was taken into custody at gunpoint, after using a small child as a shield. Maneatis denied involvement in the post office robbery. However, he admitted purchasing a PMO from the Crabtree post office on December 29, 2004, and he said that defendant was with him that day, along with Maneatis' son. Maneatis also said defendant borrowed, and had not returned, a Chevrolet Venture mini-van Maneatis rented on December 29, 2004.

On January 8, 2005, two women cashed or attempted to cash seven of the stolen PMOs at six different check cashing businesses in Salem and Keizer, Oregon. Their names were Violet Marie Adams and Carrie Healon. Adams said defendant gave her the PMOs. Adams was taken into custody the next day, after attempting to negotiate five more of the stolen PMOs on January 9, 2005. She immediately told Salem police officers that she and a friend named "Mike" had gone to a car dealership to purchase an automobile and that "Mike" was still waiting for her to return to the dealership with the cash from the PMOs. Adams advised officers that defendant was driving a blue or green Pontiac Grand Am. Officer Weidemann took custody of Adams while Officer Hill drove to the car dealership to investigate Adams' tip.

When Officer Hill arrived at the car dealership he saw a car that fit the description. The defendant, who was sitting in the driver's seat of a blue Pontiac Grand Am, made eye contact with the police, then sped from the lot. It was 7:17 p.m., and dark out. When Officer Hill attempted to conduct a traffic stop because the vehicle did not have its headlights on, and it

failed to stop at a red light, defendant led Officer Hill on a high-speed chase. Due to the danger involved, Officer Hill terminated the pursuit. However, a short time later a canine unit located the abandoned blue Pontiac Grand Am in the parking lot of an apartment complex, with the driver's door open. A police dog found defendant hiding in nearby bushes.

Defendant was handcuffed and placed in the backseat of the patrol car. Officer Hill read defendant his <u>Miranda</u> rights from a prepared card. Defendant indicated that he understood his rights, and that he did not have any questions. Defendant told officers his name was "Michael Lee." When asked for his date of birth defendant replied, "you fuckers figure that out." According to Officer Hill, defendant consented to a search of his wallet, which contained the title for the blue Pontiac Grand Am. Defendant refused to consent to a search of his pockets. The key to the Pontiac Grand Am was later found in the lining of defendant's undergarments.

Defendant was booked on state charges for criminal possession of a forged instrument, forgery, and attempting to allude a police officer. United States Postal Inspector Helton, who was investigating the Crabtree Post Officer robbery, was notified of defendant's arrest. Earlier that month Inspector Helton and his supervisor, Inspector Fernald, had notified law enforcement agencies and financial institutions of the Crabtree Robbery, and the tracking numbers on the stolen PMOs. Inspectors Helton and Fernald drove from Portland to Salem on the night of January 9, 2005, hoping to interview defendant regarding his possession of the stolen PMOs. Around 7:30 that evening they entered the interrogation room where defendant had been waiting for approximately one hour. In less than five minutes they exited the room because defendant was verbally abusive and uncooperative.

Before being transported to the Marion County Jail, defendant told Officer Hill, "You guys will hear from my attorney about my hands." When Officer Hill asked what defendant meant, defendant said, "You guys cut up my hands." Officer Hill inspected defendant's hands and saw a couple scratches on his right hand near his thumb, which appeared to be scabbed over and possibly infected. Officer Hill photographed defendant's hands because he believed defendant was threatening to bring a civil suit against him.

The Marion County District Attorney filed an information on January 10, 2005, charging defendant with one count of criminal possession of a forged instrument, and one count of attempting to elude a police officer. On January 11, 2005, defendant was arraigned before Marion County Circuit Judge Larson, represented by appointed counsel, Robert Hutchings. A preliminary hearing was schedule for January 19, 2005, and bail was set at $20,000. Defendant did not post bail.

In the meantime, on January 12, 2005, Inspector Helton obtained a criminal complaint and warrant for defendant's arrest, issued by Magistrate Judge Stewart. The complaint charged defendant with transmitting and presenting fraudulent postal money orders, in violation of federal law. The criminal complaint was filed in the clerk's office at 2:54 p.m.

On January 13, 2005, Inspector Helton and his partner, Inspector Shannon Roloff, arrived at the Marion County Jail at approximately 3:45 p.m., to transport defendant to Portland to appear in federal court. They took custody of defendant at approximately 4:15 p.m., handcuffing him to a chain attached to his waist and placing him in leg shackles. Inspector Helton sat in the back seat of the car with defendant while Inspector Roloff drove. Before the car left the fenced area of the jail, Inspector Helton advised defendant of his <u>Miranda</u> rights by reading from a

printed card. Inspector Helton testified that he did not feel comfortable giving defendant a pen to sign the standard rights card. However, defendant said he understood his rights and was willing to talk to inspectors. Both Inspector Helton and Roloff testified that defendant appeared alert and coherent, and had no apparent difficulty understanding and responding to questions. Inspector Helton also commented that defendant was markedly more cooperative, even pleasant, compared to his encounter with defendant on January 9, 2005.

Inspector Helton explained that defendant was being transported to Portland because he was a suspect in the robbery of the Crabtree post office, which was a federal offense. Though he told Inspectors they were "barking up the wrong tree," defendant did not indicate any desire to speak to an attorney. Inspector Helton testified that defendant did ask some questions about federal court procedure, and he told defendant the court would appoint a public defender to represent him, and that the public defenders are very good lawyers. Defendant was given a "Big Mac" hamburger and a soft drink, which he as able to eat on the ride, notwithstanding the fact he was handcuffed.

Defendant seeks to suppress the statements he made to Inspector Helton on the ride to Portland, including: (1) defendant said he negotiated two PMOs to purchase an automobile at Zamora's Auto Sales; (2) defendant admitted using two other people to negotiate PMOs for him; (3) defendant said he would name the robbers if all charges against him were dropped; (4) despite Inspector Helton's indication that the charges would not be dropped, defendant said the robbers were "Randy" from Lebanon and Steve Maneatis; (5) after Inspector Helton reaffirmed that he believed defendant was involved in the robbery, defendant shook his head and said, "no."

The ride and interview lasted about an hour. They arrived in Portland at approximately 5:15 p.m.. Since court had already concluded for the day, Inspectors took defendant directly to the Multnomah County Detention Center, rather than the U.S. Marshal's Service. Defendant appeared before U.S. Magistrate Judge Stewart the next day, January 14, 2005.

## Discussion

In his briefing defendant seeks to suppress statements he made to Postal Inspectors on January 13, 2005, under three theories. First, he argues Postal Inspectors failed to honor his request for an attorney. Second, defendant contends his statements were involuntary. Third, he argues even if his statements were voluntary, they should be suppressed due to impermissible delay in bringing him before a federal magistrate, in violation of 18 U.S.C. § 3501. Defendant proffered a fourth theory for suppression at the hearing- that he had already invoked his right to an attorney on this matter when he requested assistance at his arraignment on January 10, 2005, in state court.

**I.  Defendant did not invoke his right to counsel.**

Defendant argues he invoked his right to counsel on January 9, 2005, when he told Salem Police Officer Hill, "You guys will hear from my attorney about my hands." The government argues (a) defendant's reference to an attorney was actually a threat to sue arresting officers for allegedly injuring his hands, not an objective request for representation, and (b) this alleged invocation was made four days prior to questioning by U.S. Postal Inspectors, which resulted in the statements he seeks to suppress. The Postal Inspectors re-<u>Mirandized</u> defendant and defendant voluntarily waived his rights, according to the government.

The court performs an "objective inquiry" to determine whether a suspect invoked his right to counsel after being informed of his Miranda rights. Davis v. United States, 512 U.S. 452, 458-59 (1994). At a minimum, invocation of the right to counsel requires "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. at 459 (internal quotation and citation omitted). Though he "need not speak with the discrimination of an Oxford don," the defendant "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. If the suspect's request "is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62.

The government directs the court to a number of useful comparisons. In Davis, the Supreme Court held that the statement "Maybe I should talk to a lawyer," was not an unambiguous or unequivocal request for counsel. Id. at 462. In Clark v. Murphy, 331 F.3d 1062, 1070-72 (9th Cir. 2003), the Ninth Circuit held that the suspect's statement, "I think I would like to talk to a lawyer" followed by the question, "should I be telling you, or should I talk to a lawyer?" was not an unambiguous or unequivocal request for counsel. In United States v. Younger, 398 F.3d 1179, 1187-88 (9th Cir. 2005), defendant did not unambiguously invoke the right to counsel when he said, "[b]ut excuse me, if I am right, I can have a lawyer present through all this, right?" Finally, in United States v. Ogbuehi, 18 F.3d 807, 813-14 (9th Cir. 1994), the court found that the inquiry, "Do I need a lawyer?" or "Do you think I need a lawyer," was not even an equivocal request for an attorney.

On the other hand, in <u>Alvarez v. Gomez</u>, 185 F.3d 995 (9th Cir. 1999), these statements were found to by unambiguous requests for counsel: (1) "Can I get a lawyer right now, man?" (2) "You can have attorney right now?" and (3) "Well, like right now, you got one?" In <u>United States v. Cheely</u>, 36 F.3d 1439, 1448 (9th Cir. 1994), the statement, "my attorney does not want me to talk to you," was also considered to be an invocation of the right to counsel. And in <u>Robinson v. Borg</u>, 918 F.2d 1387, 1391 (9th Cir. 1990), the suspect who said "I have to get a good lawyer man, can I make a phone call?" unequivocally invoked his right to representation.

Judged against these standards, an objective police officer would not have understood defendant's statement "You guys will hear from my attorney about my hands" as a request for an attorney. To the contrary, defendant's statement indicates that he already had an attorney, and his attorney would be in contact with the police officers regarding the scratches on defendant's hands, not regarding defendant's criminal trouble.

Defendant urges this court to view his reference to an attorney in light of his general demeanor on January 9, 2005, which he says evidenced a "pattern of lack of cooperation consistent with his subjective belief that he was invoking his right to counsel. . .". Defendant's subjective belief, however, is not the relevant inquiry here. Moreover, as the government points out, when defendant was arrested for federal violations four days after his alleged request for counsel, he willingly spoke to United States Postal Inspectors after he was again advised of his <u>Miranda</u> rights. Though defendant contests the voluntariness of his alleged waiver on January 13, 2005, there is no dispute that defendant did not request an attorney on that occasion. Accordingly, defendant's motion to suppress based on the government's alleged failure to honor invocation of his right to counsel is denied.

## II. Defendant's statements were voluntary.

Defendant argues that his statements to United States Postal Inspectors on January 13, 2005, were involuntary under the "totality of the circumstances" test. He points to his low level of intelligence and the fact that he didn't sign a waiver form as proof defendant did not knowingly and voluntarily waive his right to remain silent.

To decide whether a statement was obtained voluntarily, this court must consider the "totality of the circumstances." See Crane v. Kentucky, 476 U.S. 683, 691 (1986). Factors relevant in this inquiry include : (a) defendant's personal history; (b) defendant's level of education; (c) defendant's physical condition; (d) defendant's age; (e) the length of detention; (f) whether statements were elicited after repeated and prolonged questioning; (g) use of physical punishment, such as deprivation of food or sleep; and, (h) whether the defendant was advised of his constitutional rights. Id.; see also Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The government bears the burden of demonstrating the voluntariness of the confession by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Any doubts regarding the waiver of a constitutional right must be resolved in favor of no waiver. Michigan v. Jackson, 475 U.S. 635, 633 (1986).

Citing U.S. v. Chischilly, 30 F.3d 1144, 1151 (9th Cir. 1994), the government argues that even if defendant's mental capacity is sub par, barring evidence of physical or psychological coercion by law enforcement officials, his mental capacity is irrelevant. The government stresses that coercive police activity "is a necessary predicate" to a finding that a confession is involuntary. Connelly, 479 U.S. at 167; see also Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003)("the question is whether the defendant's will was overborne at the time he confessed"); see

also <u>Derrick v. Peterson</u>, 924 F.2d 813, 818 (9th Cir. 1990)(defendant's personal characteristics "are constitutionally irrelevant absent proof of coercion").[1]

Defendant does not allege coercion. He simply cites <u>Culombe v. Connecticut</u>, 367 U.S. 568 (1961), for the proposition that waivers have been found invalid due, in part, to the defendant's lack of mental ability. Notably, in <u>Colombe</u>, defendant was found to have the mental capacity of a nine-year-old, and he confessed after repeated questioning. In the instant case, the only information before the court regarding defendant's alleged mental impairment is his statement that he has "been receiving Social Security disability benefits for over five years due to mental retardation." Yet defendant's own witness, John Callisen, testified that he thought defendant was actually quite intelligent because he owned nice things and he used people to his advantage. Under <u>Connelly</u>, defendant's allegation, without evidence of coercion, is not enough to prove involuntary waiver. 479 U.S. at 167.

Further, though a written waiver "is usually strong proof of the validity of that waiver," it is "not inevitably either necessary or sufficient to establish waiver." <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>see also</u> <u>U.S. v. Calise</u>, 996 F.2d 1019, 1022 (9th Cir. 1993)(defendant orally agreed to talk with government interrogators, explicitly waiving his rights); <u>see also</u> <u>U.S. v. Younger</u>, 398 F.3d 1179, 1185 (9th Cir. 2005)("police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights"). Officer Helton testified that he

---

[1] Nevertheless, the government contends defendant's statements were also voluntary under the totality of the circumstances. The government points out that the interview lasted about one hour- the time it takes to drive from Salem to Portland- and the Postal Inspectors gave defendant food, which he was able to eat because his hands were handcuffed in front of his body. Defendant was cooperative that day, unlike on January 9, 2005, when he was arrested on state charges and made reference to an attorney. Further, the government notes that defendant is 49 years old, has a lengthy history of police contacts, and that he was advised of and stated that he understood his rights.

Page -11- OPINION AND ORDER

did not ask defendant to sign the waiver form when he read him his rights on January 13, 2005, because he was afraid to give defendant a pen because of defendant's violent behavior during their recent encounter on January 9, 2005. Both Officer Helton and Officer Roloff gave convincing testimony at the hearing that defendant clearly indicated he understood his rights, said he was willing to speak with them notwithstanding his right to remain silent, and at no time expressed a desire to stop speaking, or to speak to an attorney.

Thus, I find the preponderance of the evidence supports the government's assertion that defendant verbally waived his Miranda rights. Defendant's motion to suppress based on involuntariness is denied.

**III.  Defendant's statements were made inside the six-hour 'safe-harbor' under 18 U.S.C. § 3501(c), and are therefore admissible.**

Defendant's third theory why his statements should be suppressed is based on the government's alleged violation of Federal Rule of Criminal Procedure (FRCP) 5(a), and 18 U.S.C. § 3501(c).

FRCP 5(a) requires the defendant to be taken, "without unnecessary delay before a magistrate judge" or another judicial officer following arrest. "Courts look to 18 U.S.C. § 3501(c) to determine whether pre-arraignment statements obtained in violation of [FRCP 5(a)] are admissible." U.S. v. Van Poyck, 77 F.3d 285, 288 (9th Cir. 1996). Section 3501(c) provides, in part:

> In any criminal prosecution by the United States . . . a confession made or given by a person who is a defendant therein, while such a person was under arrest or other detention *in the custody of any law-enforcement officer or law enforcement agency*, *shall not be inadmissible* solely because of *delay* in bringing such a person before a magistrate . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person *within six hours immediately following his arrest or other detention*:

> Provided, That the time limitation in this subsection shall not apply in any case in which the delay in bringing such a person before such magistrate or other officer *beyond such six-hour period* is found by the trial judge to be *reasonable considering the means of transportation and the distance to be traveled* to the nearest available such magistrate or other officer.

(emphasis added). Thus, section 3501(c) "creates a six-hour 'safe harbor' between the commencement of detention on a federal charge and appearance before a magistrate judge during which a voluntary confession is admissible." U.S. v. Michaud, 268 F.3d 728, 734 (9th Cir. 2001), *cert. denied*, 537 U.S. 867 (2002).

According to defendant, statements he made to United States Postal Inspectors on January 13, 2005, must be suppressed because they were made four days after his arrest, well beyond the statutory six-hour 'safe harbor,' and the government proffers no excuse for the delay. Rather, the government contends defendant's argument is premised on a flawed interpretation of section 3501(c). The government argues that its duty under section 3501(c) was triggered by defendant's arrest on federal charges January 13, 2005, not his earlier arrest and detention on state charges, by state officials, on January 9, 2005. Thus, the government contends, defendant's statements were made within the statutory 'safe-harbor' because they were made within an hour after his federal arrest.

The government's position is supported by the Supreme Court's ruling in U.S. v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994). In Alvarez-Sanchez, the Court held:

> Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against laws of the United States," and therefore, no "delay" under § 3501(c) can occur.
>
> In short, it is evidence "from the context in which [the phrase] is used," that the "arrest or other detention" of which the subsection speaks must be an "arrest or other detention" for

> violation of federal law. If a person is arrested and held on a federal charge by "any" law enforcement officer– federal, state, or local – that person is under "arrest or other detention" for purposes of § 3501(c) and its 6-hour safe harbor period. If, instead, the person is arrested and held on state charges, § 3501(c) does not apply, and the safe harbor is not implicated.

(internal quotations and citation omitted).

Thus, under <u>Alvarez-Sanchez</u>, defendant's contention is plainly wrong. Further, the fact that federal officers were notified of a likely violation of federal law on that day, and that Postal Inspector Helton attempted to interview defendant that day, is "unimportant." <u>Id</u>. at 358 (section 3501(c) does not apply, even if arresting officers believe or have cause to believe the suspect may have also violated federal law); <u>see also</u> <u>U.S. v. Rowe</u>, 92 F.3d 928, 932 (9th Cir. 1996), *cert. denied*, 519 U.S. 1100 (1997).

On January 12, 2005, Magistrate Judge Stewart issued a criminal complaint and arrest warrant charging defendant with a violation of 18 U.S.C. § 500. The next day, January 13, 2005, United States Postal Inspectors Helton and Roloff arrested defendant at the Marion County Jail, and drove him to Portland. On the way, during defendant's first hour in federal custody, the inspectors interviewed defendant. This interview took place well within the section 3501(c) six-hour safe-harbor, and defendant's statements were otherwise voluntary.

Defendant's allegation of unreasonable delay is also premised on an improper interpretation of the facts. Defendant was brought before Magistrate Judge Stewart on January 14, 2005, because court had concluded by the time Inspectors arrived in Portland the afternoon of January 13, 2005. However, as noted, the Magistrate had already made a probable cause determination on January 12, 2005, before defendant's arrest. Thus, the law of <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991), which requires a probable cause determination

within 48 hours of arrest, was not violated here.

Accordingly, defendant's motion to suppress based on a violation of section 3501(c) is denied.

**IV.     Defendant's invocation of the Sixth Amendment right to counsel with respect to state charges did not attach to federal charges defendant had not yet been arraigned on.**

At the hearing, defendant's counsel argued that since defendant was appointed counsel on January 10, 2005, at his arraignment on state charges, he had constructively invoked counsel with respect to the criminal conduct the federal charges are based on.

As the government correctly argued, the Sixth Amendment right to the assistance of counsel is "offense specific." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). As the Supreme Court explained in McNeil, "the purpose of invoking it – is to protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime." 501 U.S. at 177-78 (internal quotations and citations omitted). It is the Fifth Amendment protection against self-incrimination that safeguards "the suspect's 'desire to deal with the police only through counsel'." Id. at 178 (quoting Edwards v. Arizona, 451 U.S. 477, 484 (1981)). "To invoke the Sixth Amendment interest is, as a matter of *fact, not* to invoke the Miranda-Edwards interest." McNeil, 501 U.S. at 178 (emphasis included).

As discussed above, invocation of the right to counsel requires an unequivocal expression of the desire for assistance of an attorney in dealing with questioning by the police. There is no dispute that defendant did not indicate any desire to speak to an attorney before answering Inspector Helton's questions on January 13, 2005. Therefore, I find that defendant did not invoke his Fifth Amendment right to counsel on the present charges by requesting appointment of

Page -15- OPINION AND ORDER

counsel at his arraignment on the state charges. Id. at 178; but see U.S. v. Martinez, 972 F.2d 1100 (1992)(invocation of Sixth Amendment right to counsel in state court may prevent future federal questioning if state and federal officials jointly determined which forum defendant would be prosecuted in).

## Conclusion

For the reasons discussed above, defendant's motion to suppress statements (#31) is DENIED.

IT IS SO ORDERED.

Dated this 25th day of July, 2005.

        /S/ James A. Redden
James A. Redden
United States District Judge